J-S15014-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF:  D.S. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.L., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1602 WDA 2019 |

Appeal from the Order Entered September 26, 2019
In the Court of Common Pleas of McKean County Orphans' Court at
No(s):  NO. 42-18-292

| | | |
|---|---|---|
| IN THE INTEREST OF: C.L. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.L., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1603 WDA 2019 |

Appeal from the Order Entered September 26, 2019
In the Court of Common Pleas of McKean County Orphans' Court at
No(s):  42-17-286

BEFORE:   BENDER, P.J.E., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    FILED MAY 27, 2020

L.L. ("Mother") appeals from the orders dated September 20, 2019 and entered September 26, 2019, which granted the petitions filed by McKean County Children and Youth Services ("CYS") to involuntarily terminate her parental rights to her minor son, C.L. (born in June of 2013), and her minor

_____

[*] Former Justice specially assigned to the Superior Court.

daughter, D.S. (born in February of 2017) (collectively "Children"), pursuant to sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1, 2] After careful review of the record and applicable law, we affirm.

C.L.'s case was initiated by CYS on March 8, 2016, with the filing of a request for emergency custody and a dependency petition. C.L. was adjudicated dependent on May 9, 2016, and was placed into foster care with S.L. ("Foster Mother") and M.L. ("Foster Father") (collectively "Foster Parents"). Following numerous permanency review hearings, CYS filed its petition for involuntary termination of Mother's parental rights to C.L. on December 13, 2017. The following findings from the Master's Recommendation in the dependency action were adopted by the orphans' court and incorporated in its memorandum regarding the termination of Mother's parental rights of C.L.:

> [C.L.] has resided exclusively with [Mother and Father] and his 4 year old half[-]brother since birth. [Mother and Father] moved into their current residence in November [of] 2015. [They] admit to locking [C.L.] and his 4 year old sibling [(collectively "the boys")] into their bedroom for periods of time during the moving process so that the [boys] could not get into unsafe items or hurt themselves while the parents were moving items. In fact, [F]ather testified that they bought the locks for this purpose.

_____

[1] By per curiam order entered November 12, 2019, this Court sua sponte consolidated the appeals at Nos. 1602 and 1603 WDA 2019.

[2] The parental rights of S.L. ("Father") were also terminated; however, he filed separate appeals at Nos. 1586 and 1587 WDA 2019.

On January 6, 2016, [CYS] received a report regarding the [boys] being locked in their room. On January 8, 2016, [c]aseworker[,] Lindsey Johnston[,] was able to get into the home. She arrived around 1:30 p.m.[,] and the [boys] were upstairs in their bedroom at that time. There was feces on the wall and the floor of the boys' room[,] and the room smelled of feces. There were also dirty diapers under the beds. Mother explained to her that [the] boys were going through a phase where they were smearing their feces on the wall. Both boys were in diapers and were not toilet trained. There were no locks on [the] outside of [the] door, but [she] could see holes where a lock would have been. Ms. Johnston discussed at various times possible service providers with [Mother and Father], but they were not willing to accept services due to an issue that they previously had with Parents as Teachers until after the [boys] were removed from the home. To her knowledge[,] when she was in the home, [Mother and Father] were closing both doors to the stairs when the [boys] were upstairs[,] prior to the safety plan being put into place on February 17, 2016. At other times throughout [CYS's] involvement with the family[,] both before and after the safety plan was put in place, caseworkers took pictures of the [boys] in their bedroom window at various times throughout the day. On at least one occasion after [implementation of] the safety plan, a picture was taken at one time and then another taken approximately an hour later[,] and the [boys] were still in their upstairs bedroom window. On January 29, 2016, two caseworkers (Ms. Dunkle and Ms. Little) were in the home for a home check and watched the [boys] change their own diapers.

Two other adults, Shelby Hagen and Matthew Carlson, who resided in the same residence with the family from approximately December [of] 2015 until late February [of] 2016, both testified that [Mother and Father] kept the [boys] in their rooms for extended periods of the day and that the [boys] were up typically before their parents. Also, Ms. Hagen, Mr. Carlson, and [M]other acknowledged that the [boys] actually played in their feces and smeared it on themselves four to five times. Mother characterized the boys['] doing this as a "habit" during testimony and [as] a "phase" to caseworker Johnston, which would connote more than a limited number of times. Ms. Hagen and Mr. Carlson assisted [Mother and Father] with the [boys] at least a few times per week when [they] were sleeping. [CYS] witnessed Mr. Carlson attending to the [boys] on at least one occasion while [Mother and Father] slept. The [boys] woke between 6:00 a.m. and 7:00 a.m.

each day and were allowed to be awake for a couple hours, then took a nap upstairs in their room with the door shut, as well as the two doors on the steps being closed. The [boys] also often took "naps" in the afternoon and were often shut in their room in the afternoon as well. The bedroom was devoid of toys or anything with which the [boys] could occupy themselves.

On February 16, 2016, Jerry Prosser[,] who owns a home next to where [Mother and Father] reside[,] was in the garage of his property when he heard glass break and went to see what was happening. He saw two little boys, both naked, swinging from the curtains hanging out one of the upstairs windows of the family's residence. He went running and hollering[,] afraid he would have to catch one or both of them. However, both boys fell into the room. He heard one boy yell[,] "he's bleeding." He started banging on the door to [the] residence[,] and after 45 to 50 seconds[,] he heard a woman's voice asking what's going on in there. He told the woman through the window he was an EMT and asked to check [on] the child. Eventually, he was let in the door[,] and [he] went upstairs. [Father] did not know why he was in the house and had not even gotten upstairs until approximately the same time as Mr. Prosser. The child was taken to the [e]mergency [r]oom in the family's vehicle and received stitches to his leg. On that date, Mr. Prosser observed the house to not be kept and stated [that] it was quite a bit cooler upstairs than downstairs.

The next day, February 17, 2016, [CYS] put in place a safety plan, which was signed by both [Mother and Father], to address supervision of the [boys].... [O]ne of the requirements of this safety plan was that the doors between the upstairs and downstairs needed to remain open, as did the door to the [boys'] bedroom. However, on multiple occasions after the safety plan was in place[,] the doors were observed to be closed[,] and [Mother and Father] admitted to closing the doors occasionally[,] even after the safety plan.

On March 3, 2016, [c]aseworker[,] Brittani Falconi, went to the family's home to see Ms. Hagen and Mr. Carlson on an unrelated matter. When she arrived, she found out the boys were in their room. There was a pile of soiled[,] torn[-]up diapers in the upstairs hallway[,] and the door to the upstairs was closed. When she checked on the boys, their room had a strong odor and there was vomit on the comforters. She took a picture of the diapers in the hallway at 4:06 p.m. Ms. Falconi witnessed [M]other come up and then go back downstairs while she was with

- 4 -

her clients before she checked on the boys herself.  Ms. Falconi, based on the room conditions, called her supervisor.  This prompted [an] on-call [caseworker] to respond, as well as law enforcement.  Mother indicated [during her] testimony that the [boys] went for a nap at 4:00 p.m.; however, she told caseworker[,] Danielle Little[,] who was on call that day[,] that the [boys] had gone down for a nap at 11:00 a.m.[,] and it was between 5:00 p.m. and 5:30 p.m. when Ms. Little arrived at the house.  Ms. Little and Officer Jason Putt of the Bradford City Police Department both saw vomit and human feces in the boys' room on the wall, floor, and bed[,] and on the [boys].  The door to the upstairs was shut when Officer Putt and Ms. Little arrived.  No one could explain why the [boys] were vomiting, so Ms. Little took them to the [e]mergency [r]oom.  Upon arrival [at] the [e]mergency [r]oom, one child was wearing shoes, on which human feces was caked[,] and when he took off his shoes, he also had human feces caked on his feet and under his toenails.  The other child was wearing footie pajamas[,] on which human feces was caked on the bottoms.  Both [boys] had human feces caked under their fingernails.

Mother suffers from bipolar disorder and anxiety and has partial complex seizures.  She treats with The Guidance Center[,] and is prescribed medications.  Father is diagnosed with intermittent explosive disorder, is treated through The Guidance Center[,] and is prescribed medication.

The Master specifically finds that … [M]other and [F]ather were not providing adequate supervision to [C.L.] or his 4[-]year[-]old sibling by keeping them contained in their bedroom for extended periods of the day.  Neither [M]other nor [F]ather acknowledge that there is anything inappropriate about keeping children ages 2 and 4 in a bedroom with a door shut upstairs[, and] with two additional doors shut between the [boys] and the downstairs.  This is clearly a lack of appropriate supervision which led to the [boys] doing things[,] such as smearing their own feces all over their room and themselves[,] … breaking the upstairs window[,] and swinging on the curtains.  It is specifically found that [M]other['s] and [F]ather's testimony that the [boys] were unattended for limited periods of time is not credible[,] as otherwise the adults would have noticed the condition of the [boys] and their room[,] and the [boys] could not have gotten human feces under their fingernails and toenails and caked on their feet and shoes in a brief period of time.  Even if [M]other['s] and [F]ather's testimony were credible and the [boys] were left

- 5 -

completely unattended upstairs with all the doors shut for shorter periods of time, this still evidences an extreme lack of supervision on [M]other['s] and [F]ather's part[,] as these [boys] are 2 and 4 years of age.

Orphans' Court Memorandum ("OCM I"), 9/26/19, at 2-4 (1603 WDA 2019) (quoting Master's Recommendation, 5/19/16).

CYS received a referral regarding D.S. on the date of her birth. Two days later, she was placed in the same foster home as C.L. and their half-brother, pending adjudication. C.L. was adjudicated dependent on December 6, 2017. On November 9, 2018, CYS filed its petition for involuntary termination of Mother's parental rights of D.S. The orphans' court incorporated the following findings with respect to D.S. from the dependency hearing in its memorandum regarding the termination of Mother's parental rights of D.S.:

At the time [D.S.] was born[,] Mother and Father were separated. Mother had a different paramour who she was residing with and her relationship with Father at the time was hostile…. Paternity testing has confirmed that [Father] is [D.S.'s] biological [f]ather.

After [D.S.'s] birth[,] Mother and Father reconciled. They have a multi[-]bedroom home. It has been kept clean and neat and appropriate for [D.S.] to reside in. [Mother and Father] have a crib there and other appropriate supplies. Concerns were expressed regarding fleas in the home and cat feces and/or vomit. However, other credible witnesses' testimony demonstrated that this is not a significant concern. Concerns were also raised regarding Mother['s] operating a vehicle. The assertion is that she has a seizure disorder and that it is, therefore, a danger to her, … [C]hildren (if they are in the car with her)[,] and to the general public[,] if she operates a motor vehicle. However, … the initial assertion that Mother has a seizure disorder is based solely on limited prior statements that she does have such a disorder. There is no medical evidence to support this assertion. CYS did submit a [c]ertified [h]istory of Mother's [d]riving [h]istory[,] and

- 6 -

it does contain several convictions for "Drive While Re. Susp/Rev" and "No License." However, there are no medical restrictions listed regarding Mother's license status....

Father is employed and there are times that[,] if [D.S. were] in [Mother and Father's] care, Mother would be the primary caretaker for [D.S.] There have been times during visits with [D.S.] that [Mother and Father] have failed to provide appropriate attention regarding [D.S.'s] care. She has been left in her swing somewhat longer than was appropriate without [Mother or Father] taking her out and directly interacting with her. [Mother and Father] have also inappropriately relied on case aides to watch [D.S.] when they go outside to smoke.... [T]he testimony of other credible witnesses did not completely eliminate concerns regarding the lack of interaction[,] but did diminish concerns. For example, Kelly Zetwick, who is employed by [T]he Guidance Center and works with the ... family, testified. She stated that she is working with this family as part of the Parent[s] as Teacher[s] program. She has worked with [them] since September of 2017[,] and attends visits at [their] home. She testified that the visits "are going very well," and "[Mother and Father] are participating in the visits." She indicated that [they] both ... ask appropriate questions and respond to her suggestions. There were issues regarding missed visits in [their] home. Caseworker Joshua Blotzer testified that several visits were cancelled when he arrived at [Mother and Father's] home and no one answered the door. These visits were scheduled to commence in the morning, [with a] 7:30 a.m. to 8:30 a.m. start time. Although [Mother and Father] certainly should have been awake and prepared for the visits, it is unclear why greater efforts weren't made to wake [them] and to address the problem[.] Caseworker Blotzer testified that he knocked for two or three minutes[,] and when no one responded[,] he left. It was unclear how loud[ly] he knocked....

Mother was ordered as part of a dependency action for a sibling of [D.S.] to obtain an updated mental health evaluation and [to] follow through with recommend[ed] treatment. She was also ordered to complete Parent Child Interactive Therapy (PCIT). Mother has not obtained the evaluation and has refused to complete the PCIT program.... [Her] only explanation for why she did not complete the PCIT program was that she dislikes the therapist who administers the program. This is a very negative development[,] as Mother should put her child's interest first and not her own personal feelings. [Mother and Father] have also had

an issue with signing requested releases for CYS to obtain information regarding their progress or lack of progress. Both [Mother and Father] have argued over small details, like a name being misspelled, and used this as an excuse not to sign requested releases or paperwork. This attitude, which doesn't occur all the time, is still troubling and counterproductive. It reflects [their] attempt to battle and nitpick instead of focusing on what needs to be done to get … [C]hildren back into their care.

Orphans' Court Memorandum ("OCM II"), 9/26/19, at 2-4 (1602 WDA 2019)

(quoting Orphans' Court's Findings, 12/6/17).

Additionally, the orphans' court issued the following findings regarding

both Children:

> In both C.L.'s and D.S.['s] dependency proceedings[,] [Mother and Father] were ordered to: 1) follow through with the Parents as Teachers [p]rogram; 2) keep their home clean and neat and appropriate for the return of [Children] at any time; 3) fully cooperate with service providers and CYS at all times; 4) sign releases requested by CYS for the release of information regarding [Mother's and Father's] progress in services and treatment and [with] [C]hildren; 5) attend all medical appointments for … [C]hildren; 6) be awake and ready for visits when CYS and/or service providers arrive at their home with … [C]hildren; and[] 7) provide urine screens when requested by CYS. Visits were set for [twice per] week, 4 hours each.
>
> At a review hearing held on June 21, 2018[,] the court found that [Children] were doing well in the [Foster Parents'] home. However, [C.L.] was experiencing some behavioral difficulties. Mother had made some progress regarding the reunification plan. She was fully cooperating with the Parents as Teachers [p]rogram. [Mother and Father] had missed some of D.S.['s] medical appointments[,] but there was a reasonable explanation [as to] why they had missed several of them. [Mother and Father] did not sign releases as ordered by the court. They would sign some of them but argued … regarding the release of all relevant information, particularly regarding their progress in treatment. The court specifically indicated at the hearing and in the review order for the hearing: "If Mother and Father won't allow the court and CYS to see how things are going[,] the court will assume there is something that [Mother and Father] do not want us to see."

The court also found: "Mother's reluctance (regarding the releases and following the plan in general) is motivated, maybe even mandated, by Father." Meetings and discussions with Father and CYS were unproductive.... Father was ordered to complete anger management therapy/counseling. [Mother and Father] were again ordered to sign requested releases and [to] follow the disposition plan. The [f]indings and [o]rder from the June 21, 2018[] review hearing [were] admitted as part of the permanency hearing record.

At the time of the August 13, 2018[] [review] hearing[,] Mother and Father had separated.... Based on the lack of progress regarding the reunification plan and the turmoil in [Mother and Father's] current situation/relationship[,] the visitation schedule was modified to one supervised visit between Father and ... [C]hildren each week[,] and one (separated from that with Father) with Mother. [Mother and Father] had also missed several appointments for themselves and ... [C]hildren and were not attending their mental health appointments.

OCM I at 14-17.

The orphans' court held hearings on the termination petitions on April 5, June 11, and August 30, 2019. Multiple witnesses were called by CYS; however, Mother and Father did not testify. See OCM I at 17-37 (summarizing the witnesses' testimony). On September 26, 2019, the orphans' court entered its memoranda and orders terminating Mother's parental rights to Children, pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b). See OCM I; OCM II.

On October 25, 2019, Mother filed timely notices of appeal, along with concise statements of matters complained of on appeal, pursuant to 23 Pa.C.S. § 2511(a)(2)(i). Mother now presents the following issue for our review: "Whether the [orphans'] court abused its discretion in finding that [CYS] produced clear and convincing evidence to support an involuntary

termination, under 23 Pa.C.S.[] [§§] 2511(a)(1), (a)(2), (a)(5) and (a)(8)[,]

of [Mother's] parental rights[?]" Mother's Brief at 9.

We review an order terminating parental rights in accordance with the

following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009) (quoting In re S.H., 879

A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

Id. (quoting In re J.L.C. & J.R.C., 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented

and is likewise free to make all credibility determinations and resolve conflicts

in the evidence. In re M.G., 855 A.2d 68, 73-74 (Pa. Super. 2004). If

competent evidence supports the trial court's findings, we will affirm even if

the record could also support the opposite result. In re Adoption of T.B.B.,

835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under [s]ection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. R.N.J., 985 A.2d at 276.

With regard to section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In In re C.M.S., 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. Id. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. In re K.Z.S.,

946 A.2d 753, 762-63 (Pa. Super. 2008).  Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.  Id. at 763.

In re Adoption of J.M., 991 A.2d 321, 324 (Pa. Super. 2010).

In this case, the trial court terminated Mother's parental rights pursuant to sections 2511(a)(1), (2), (5), (8), and (b).  We need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm.  In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).  Here, we analyze the court's decision to terminate under section 2511(a)(8) and (b), which provide as follows:

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

We first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to section 2511(a)(8).

> "[T]o terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." In re Adoption of M.E.P., 825 A.2d 1226, 1275-76 (Pa. Super. 2003); 23 Pa.C.S.[] § 2511(a)(8). "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." In re A.R., 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. Id. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. In re Adoption of T.B.B., 835 A.2d 387, 396 (Pa. Super. 2003); In re Adoption of M.E.P., supra.

In re Z.P., 994 A.2d 1108, 1118 (Pa. Super. 2010) (emphasis added).

Here, Mother argues that the orphans' court erred in terminating her parental rights pursuant to section 2511(a)(8). Mother's Brief at 18. She avers that the conditions which led to Children's removal "were remedied, and to the extent that they were not, [Mother] was continually engaging in services reasonably likely to remedy the conditions[.]" Id. Mother claims that she "maintained an appropriate home with no safety concerns and had appropriate parenting skills." Id. at 22. She further contends that she had a plan in place for Children's return home. Id. With regards to her mental

health, Mother admits that she was inconsistent with her mental health treatment, but asserts that CYS "completely failed to establish that there was ever any ongoing mental health concerns as it relates to [Mother's] cooperation with services or [the] ability to parent her [C]hildren." Id. at 24-25. Regarding the needs and welfare of Children, Mother states that the orphans' court "completely ignored [her] progress and [C.L.'s] continued stated preference that [he] wished to return to [Mother's] care." Id. at 25. In sum, Mother argues that she rectified the conditions that led to placement, and that CYS presented insufficient evidence to terminate her parental rights. The record belies her claims.

As to the first element of section 2511(a)(8), concerning whether Children have been removed from parental care for twelve months or more, the orphans' court explained that C.L. has been in placement with his Foster Parents for over 3½ years, and D.S. has never resided with Mother and Father. She was placed with Foster Parents two days after her birth in February of 2017. Thus, the statutory period of twelve months has clearly been met.

As to the second element of section 2511(a)(8), regarding whether the conditions which led to Children's removal continue to exist, the orphans' court found that the reason Children were placed into foster care was Mother's (and Father's) "inability to provide stable, safe and appropriate care for [them]." OCM I at 41; OCM II at 47. In support of its determination that these conditions still exist, the orphans' court opined:

Time after time after time[,] witnesses testified to Father's explosive anger and confrontational approach. Instead of focusing on the care ... [C]hildren need and improving their parenting skills, [Mother and Father] are focused on the immediate fight, creating a fight regarding just about everything.... Although she has not shown the same level of anger and hostility as Father (but still demonstrating a greater level of hostility than is justified), Mother completely defers to Father in everything. She accepts his anger and outrage as appropriate, defending it instead of stepping up and acting as a parent when it is clear that Father can't or won't.

Even though [Mother and Father] have refused to share information and sign releases, there is still evidence in the record that demonstrates that [they] both ... have a long, significant[,] and concerning mental health history/conditions. The Guidance Center records reflect that [Mother and Father] have been involved in mental treatment for some time, with sporadic attendance and limited motivation to address their mental health.... Mother outlined her very traumatic childhood to Dr. [Peter] von Korf,[3] including being removed from her biological parents. She indicated that she suffers from depression. She has been involved in "medication management appointments" at times, but has also indicated that she hasn't been taking her prescribed medications. With this known history in mind[,] it is very troubling that [Mother and Father] are refusing to allow CYS and ... the court additional information regarding their mental health situations. Mother has directly stated that she "did not want her mental health records to be reviewed by CYS...."

In addition to their very negative attitude preventing progress when they do actually appear for appointments, services, etc., [Mother and Father] have a consistent pattern of not showing up at all. The number of missed and late appointments by [Mother and Father] is so substantial it demonstrates: 1) they are intentionally missing them just to be difficult; or[] 2) they have an engrained psychological flaw or condition that prevents them from being able to understand and make meaningful efforts to appear for appointments. They have been late for or failed to appear for: court proceedings, the evaluation with Dr. von Korf

_____

[3] Dr. von Korf is a clinical psychologist who specializes in the field of bonding and assessment. He met with Mother, Father, C.L., and Foster Parents and conducted several clinical psychology tests. The orphans' court found Dr. von Korf's testimony and opinions "highly credible." OCM I at 19.

> (caused him to have to change his schedule for the evaluation), mental health counseling appointments, important school meetings, visits with … [C]hildren, medical appointments, and[] appointments with service providers.  [Mother and Father] have been substantially late or failed to attend more appointments, etc., than they have appeared for.

OCM I at 41-43; OCM II at 47-49.  The court further observed that since the beginning of the dependency proceedings, the only thing that has changed is "an increase in Mother's … hostility to services and an increase in the list of those that have tried to help [Mother and Father,] only to face Father's anger and hostility."  OCM I at 43; OCM II at 49.  The court emphasized that "although Father is at the center of the majority of the hostility, Mother is either complacent to it or supportive of it."  Id.

Finally, as to the third element of section 2511(a)(8), concerning whether termination of parental rights would best serve the needs and welfare of Children, the orphans' court found that CYS has met its burden.  See OCM I at 44; OCM II at 50.  The court determined that sufficient evidence was presented to demonstrate Mother is incapable of and/or refuses to provide appropriate care for Children.  Id.  The court elaborated:

> [Mother's] mental health situation and history prevent [her] from being able to understand proper parenting techniques and the needs of any children in [her] care.  As Dr. von Korf explained, [Mother and Father] still don't recognize the severity of their prior actions, like locking [C.L.] and his half-brother in a feces filled room.  He pointed out that Mother brushed this aside by explaining[,] "C.L.'s room was a little messy." If they are unwilling to accept that there was a problem, and they definitely are not willing to accept that there was, there is[,] no potential for change; and, if there is no potential for change[,] there is the definite, in fact highly likely probability, that if [C]hildren are in

their care in the future it will result in further locked rooms and emotionally and physically damaged [C]hildren.

OCM at 50. We deem the orphans' court's determination under section 2511(a)(8) to be well-supported by the record, and we discern no abuse of discretion.

Mother does not contest the trial court's application of section 2511(b). In light of the brief submitted by Children's legal counsel, however, we review the court's analysis under this subsection.[4] The orphans' court opined the following regarding D.S. and her bond with Mother:

> [D.S.] has a very limited bond with [Mother and Father]. For the two years and seven plus months of her life[,] she has been in the care of [Foster Parents,] and she recognizes them as her parental caretakers. The frequent missed visits and appointments by [Mother and Father] ha[ve] limited the bond and connection that [D.S.] could have had with [them]. Further, to the extent that she has one[,] it is a negative bond. [Mother and Father] have an inability to understand and learn how to lovingly interact with her and provide for her needs.
>
> [D.S.] has a strong and stable bond with [Foster Parents], their family members[,] and her brother[,] C.L. If … [C.L.] was removed from [Foster Parents'] home[,] D.S.] would suffer a loss from losing her connection with C.L. However, there is also [a] strong basis to terminate Mother's and Father's parental rights for C.L. and to allow him to also be adopted by [Foster Parents].

OCM II at 51.

_____

[4] In In re Adoption of L.B.M., 161 A.3d 172 (Pa. 2017), our Supreme Court held that 23 Pa.C.S. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome. Id. at 174. Here, C.L. expressed a desire to reunite with Mother and Father. Accordingly, the orphans' court appointed separate legal counsel to represent Children's legal interest.

In regards to C.L., the court concluded:

> [C.L.] does have a bond with [Mother and Father], but [it] is not a productive bond. The court accepts Dr. von Korf's opinion that C.L.'s bond with [Mother and Father] "is out to extreme on insecure, ambivalent bond" [which negatively affects] C.L.'s security and development. [5] The court also accepts Dr. von Korf's opinion that "if [Mother's and Father's] rights were terminated, and [C.L.] recognizes permanency in [the] foster home, [he] would want therapy [for him], but it would be his final opportunity to get permanency."

OCM I at 44-45.

Counsel for Children argues that the orphans' court's findings are not supported by competent evidence and that severing the bond between C.L. and Mother would cause irreparable harm. See Brief of Counsel for Children at 2. Counsel for Children avers that the orphans' court failed to give primary consideration to C.L.'s developmental, physical, and emotional needs, in accordance with section 2511(b). Id. Counsel asserts that C.L.'s wishes to be returned to Mother and Father have been made known,[6] and claims that

_____

[5] Dr. von Korf described an insecure bond as where "a parent downplays [a] child's needs" and "routinely prefers [the] child to be self-occupied." OCM I at 20. He described an ambivalent bond as: "The child is resistant. On shaky terms with parents. Aggressive, cry. Behaviors make no sense. Parents have been inconsistently available. All too often[,] parents are not responding to the child's needs. The child has temper tantrums, [is] anxious." Id. at 20-21.

[6] Counsel cites numerous examples in support of his claim. See Id. at 5 (C.L.'s Spanish teacher, Miss Splain, testifying that C.L. told her he wants to live with Mother and Father) (citing N.T. Termination, 4/5/19, at 173); Id. at 6 (caseworker, Elizabeth Girard, testifying that C.L. misses Mother and Father "and would like to go live with them") (quoting N.T. Termination, 6/11/19, at 85); Id. (Foster Mother's stating: "If you ask him, [C.L.] says he does want

the orphans' court abused its discretion in failing to properly consider the damage that would result from terminating Mother's parental rights to him. Id. at 5, 7.

Contrary to Children's counsel's assertion, the orphans' court gave weight and consideration to C.L.'s indication that he wants to live with Mother and Father. See OCM I at 45; OCM II at 51. However, the court agreed with Dr. Korf's opinion that:

> "C.L.'s preference does not impact my opinions here today. He … feels attachment to [Mother and Father]. He is insecurely attached to them. He has the capacity of a 5 year old. He does not have the ability to step back on his experiences with them." C.L.'s preference is based on the appropriate limits that are placed on him in the foster home. He "does not like the rules in the foster home" and believes there will be less rules and hassle in [Mother and Father's] home. However, it is the existence of those "rules" and stability in the [Foster Parents'] home that give him, an already troubled child due to his past with [Mother and Father], the greatest opportunity to have a productive childhood and [to] grow into a stable adult. It was very revealing when C.L.'s teacher indicated that C.L. [would] tell her that he "hates school" and "I won't have to go to school when I live with [Mother and Father]." Where did this thought come from? C.L. either concluded, because he is an observant young man, that [Mother and Father] aren't on the ball and probably won't be able to get him to school if he resides with them; or, [Mother and Father] told him that he won't have to go to school if he lives with them. Either way, the "lack of school with [Mother and Father]" comment by C.L. demonstrates that his preference is based on his consideration of invalid factors. Therefore, the court concludes that termination of parental rights for C.L. will also best fulfill his developmental, physical and emotional needs and welfare…. [D.S.] will [also] be able to maintain her relationship and connection with C.L.[,] if parental rights are terminated regarding her….

_____

to go live with his [Mother and Father]") (quoting N.T. Termination, 6/11/19, at 85).

> The court specifically finds that: 1) [Foster Parents] have been providing exceptional care for [Children]; 2) [Foster Parents'] ability to provide care for ... [C]hildren has been limited by the fact that [Mother and Father] have refused to assist regarding [Children's] medical, educational[,] and mental health care[,] ... and [Foster Parents] do not have authority to do so; and 3) [Foster Parents] plan on adopting [Children] if that is an option.

OCM II at 51-53. We are convinced that the orphans' court carefully and thoroughly considered Children's best interest, in light of C.L.'s stated preference. We discern no abuse of discretion as to section 2511(b).

Accordingly, we affirm the orders terminating Mother's parental rights to Children, pursuant to 23 Pa.C.S. § 2511(a)(8) and (b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/27/2020